UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODNEY JAY DANIELS,

      Plaintiff,                    Civil Action No. 16-12479

           v.                  District Judge Denise Page Hood
                                 Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Rodney Jay Daniels ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's ("Defendant's") denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #17] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #14] be DENIED.

## PROCEDURAL HISTORY

      On July 8, 2013, Plaintiff applied for DIB, alleging disability as of July 30, 2011 (Tr. 164-171). Following the initial denial of benefits, Plaintiff requested an administrative

hearing, held on August 26, 2014 (Tr. 36). Administrative Law Judge ("ALJ") Patrick MacLean presided. Plaintiff, represented by attorney Ann Sharkey, testified (Tr. 41-90), as did Vocational Expert ("VE") Diane Regan (Tr. 90-96). On October 31, 2014, ALJ MacLean found that Plaintiff was not disabled (Tr. 18-31). On April 26, 2016, the Appeals Council denied review (Tr. 1-3). Plaintiff filed the present action on June 30, 2016.

## BACKGROUND FACTS

Plaintiff, born June 21, 1974, was 40 at the time of the administrative determination (Tr. 31, 164). He completed 12th grade and received training as a welder (Tr. 198). He worked previously as a carpenter (Tr. 198). He alleges disability due to a back injury resulting from a car accident, headaches, and bowel and bladder dysfunctions (Tr. 197).

### A. Plaintiff's Testimony

*Plaintiff's counsel prefaced her client's testimony by stating that he needed both hips replaced and experienced degenerative disc disease with lower extremity radiculopathy, disc herniations, and had undergone two left shoulder surgeries* (Tr. 39-40). *She noted further that he experienced concentrational problems due to depression* (Tr. 40).

Plaintiff then offered the following testimony:

Aside from a high school diploma, his education was limited to "family training" in carpentry (Tr. 42). He was previously in the carpenters' union and held a journeyman's card (Tr. 42). He lived in a one-story house with his wife and daughter (Tr. 43). His wife sustained a traumatic brain injury ("TBI") in 2008 and currently experienced memory

problems (Tr. 44).  Plaintiff attempted to stay active at home by doing housework and cooking (Tr. 45).  He was able to vacuum but experienced difficulty mopping (Tr. 46).  He relied on a neighbor for yard work and snow removal (Tr. 46).  He accompanied his wife on grocery trips for exercise and "to keep the motivation" (Tr. 47).  He was able to lift most grocery bags (Tr. 48).  He last worked as a carpenter since 2008 or 2009 and was "between jobs" at the time of his car accident (Tr. 49).

He was unable to work due to accident-related injuries and pain (Tr. 50).  Due to migraines and the inability to sit for extended periods, he was unable to supervise others (Tr. 50).  His 2010 earnings were attributable to reimbursement by his wife's insurance company for driving her to appointments (Tr. 51).  He drove her to appointments following his own accident for a few months before his own physical problems made driving impossible (Tr. 53-55).   Plaintiff's current driving was limited to  55-minute drives to physical therapy ("PT") three days a week (Tr. 56).  Due to physical limitations, he canceled the PT sessions two or three times a month (Tr. 57).  He made the 30-mile drive to the hearing by himself (Tr. 58).  Driving a "stick shift" exacerbated nerve problems of the left leg (Tr. 58).  The longest trip Plaintiff made since his injury was a two-and-a-half-hour in-state journey to a friend's cabin (Tr. 59).

In an attempt to avoid opioid pain medication and additional surgery, Plaintiff limited his treatment to Motrin and massage therapy (Tr. 60).  Motrin caused the side effect of stomach aches (Tr. 62).  He stopped using opioid medication altogether approximately three

months before the hearing (Tr. 62). Nerve pain radiating into his left leg caused sleep disturbances (Tr. 65-66). His auto insurance covered all of his medical bills (Tr. 62). He typically experienced level "eight" pain on a one to ten scale which was reduced to a "three" when undergoing cranial-sacral therapy (Tr. 66). He also treated with a psychologist so he would not "roll backwards" (Tr. 63).

Plaintiff was able to sit for 20 minutes before experiencing discomfort (Tr. 67). He was able to stand for up to 60 minutes and walk for 90 (on a flat surface) before requiring a break (Tr. 68-69). He required a 20 minute break after standing or walking for significant periods (Tr. 69-70). His best position was lying flat on his back (Tr. 70). He was able to lift around 15 pounds (using both arms) without difficulty (Tr. 71). Due to neck problems, he experienced numbness and tingling in the right hand but was able to write and type (Tr. 71).

Plaintiff also experienced reduced memory functioning, requiring him to write down his appointments in a planner (Tr. 72-73). He lost track of movie plots after the first 90 minutes (Tr. 73). He used his computer to look at the weather and follow the news approximately twice a day (Tr. 74). Due to loss of interest, Plaintiff experienced difficulty finishing projects (Tr. 74). He did not leave the house often and seldom interacted with others (Tr. 75-76). He had not been hospitalized for mental health problems (Tr. 76).

In response to questioning by his attorney, Plaintiff reported that since the March, 2010 accident, he had undergone several surgeries and currently received disability income from his auto insurance company (Tr. 77). He had been directed to apply for DIB by doctors

working for the insurance company (Tr. 77).  He limited his chiropractic treatment because he believed it could "actually make things worse" (Tr. 78).  He spent three days each week receiving physical or cranial therapy (Tr. 78-79).  He was mentally fatigued by physical therapy and after one hour of therapy took a nap in his car before driving home (Tr. 79-80).  The cranial therapy, prescribed by his neurosurgeons, improved his condition (Tr. 82).  Plaintiff experienced "continuous" migraines and dizziness (Tr. 83).

Plaintiff also saw a therapist twice a week for "talk therapy" after feeling "hopeless" and "useless" following the car accident (Tr. 84).  He did not take psychotropic medication and was told by his therapist that he would not be required to take it until he "could possibly go suicidal" (Tr. 85).  Between 2008 and his accident, he spent his time "setting up" his company's next big construction job and helping out his wife following her accident (Tr. 86).  His wife now worked as a cranial-sacral therapist due to her own improvement from the same therapy (Tr. 88).

Plaintiff did not experience difficulty dressing except for putting on shoes and socks, and said that he could cope with the limitation by using slip-on shoes (Tr. 88).  He used biofeedback techniques to remedy leg pain while sitting (Tr. 89).  He typically performed a series of stretching exercises five to six times each day (Tr. 89).  Some of the stretches were performed in a reclining position (Tr. 90).

### B. Medical Evidence[1]

An April, 2011 neurological examination by Justin C. Riutta, M.D. was unremarkable (Tr. 733). Other treating notes from the same month note Plaintiff's report of dizzy spells and anxiety (Tr. 767). June, 2011 records by Alex M. Steinbock, D.O. note that Plaintiff was alert and full oriented and did not experience memory problems (Tr. 798). August, 2012 records by neurologist Kevin R. Lee, M.D. note Plaintiff's report of insomnia, memory loss or confusion, nervousness, and depression as a result of the March, 2010 car accident (Tr. 251). Physical therapy records from the same month note state that the dizzy spells had decreased in frequency (Tr. 837). Treating records from the following month note that Plaintiff was fully oriented (Tr. 863). November, 2011 records state that Plaintiff exhibited a normal mood and affect (Tr. 926). December, 2011 treating records by Dr. Steinbock note that Plaintiff was "awake" and "alert" with "no aphasia or dysarthria" (Tr. 584). January, 2012 treating records note a normal mood and affect (Tr. 952-953). The following month, Dr. Steinbock again observed a normal mood and cognitive abilities (Tr. 1065). April, 2012 treating records note Plaintiff's report of dizzy spells (Tr. 1038). April, 2012, treating records by Roland J. Brandt, D.O. note a normal affect (Tr. 1519).

---

[1]

Plaintiff argues exclusively that the ALJ erred by discounting treating psychologist Richard Traitel's Ph.D's opinion of psychological limitation. *Plaintiff's Brief, Docket #14.* Accordingly, treating records pertaining to the physical conditions, while reviewed in full, are mentioned only to the extent that they refer to Plaintiff's psychological functioning.

The same month, Plaintiff sought marriage counseling (Tr. 1362-1364). Intake records note that Plaintiff appeared depressed and anxious, noting that his own health problems stemming from the 2010 accident were exacerbated by his wife's limitations brought about by a 2008 closed head injury (Tr. 1363). Treating records from the next month note his report of anxiety and depression but noted Plaintiff's unremarkable appearance (Tr. 1097). He was assigned a GAF of 50 due to marital, health, and financial stressors[2] (Tr. 1363). July, 2012 psychiatric records by Mohammad Saeed, M.D. note a diagnosis of major depression, cannabis abuse, and unemployment due to physical problems (Tr. 1370). He observed that Plaintiff was fully oriented with moderate depression and a sad affect (Tr. 1370). Dr. Saeed assigned Plaintiff a GAF of 40[3] (Tr. 1370). In January, 2013, neurosurgeon Hazern Eltahawy, M.D. noted that Plaintiff was fully oriented with intact memory and a normal intellect (Tr. 645). May, 2013 records by Dr. Eltahawy also noted a normal affect and normal orientation and judgment (Tr. 1434).

---

[2]

A GAF score of 41 to 50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM-IV-TR* at 34.

[3] A GAF score of 31 to 40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders–Text Revision* ("*DSM–IV–TR*"), 34.

June, 2013 therapy records by Richard Traitel, Ph.D. note "possible moderate closed head injury consequent to automobile accident," and health, occupation, and psycho-social "stressors" (Tr. 1478).   Dr. Traitel observed an appropriate mood and that Plaintiff was coherent with "slowed cognition" (Tr. 1478).   Dr. Traitel observed that Plaintiff appeared calmer and "less scattered and more organized" (Tr. 1478).   Plaintiff reported stress resulting from his wife's unpredictable moods following her accident, coupled with his own "physical, emotional and cognitive challenges" (Tr. 1478).   He reported that he felt compelled to clean up "'every mess in the house'" to avoid anxiety (Tr. 1478).   Plaintiff reported that following his wife's closed head injury, he took a "voluntary layoff" to help with child care and household chores (Tr. 1479).   Plaintiff noted that he was cutting down on narcotic pain medication "as much as possible" (Tr. 1478).   Dr. Traitel assigned Plaintiff an "intake" GAF of 50 (Tr. 1480).   Plaintiff also expressed anxiety due to his father's terminal illness (Tr. 1480).

Dr. Traitel's treating records from the following month, noted "less anxiety but continued depression" characterized by "slowed mental speed" (Tr. 1482).   Dr. Traitel observed that Plaintiff was "reasonably coherent" (Tr. 1482).   Plaintiff reported "profound depression and grief" resulting from both the death of his father and his grandmother's stroke the same month (Tr. 1484).   He reported that his wife's forgetfulness was a "constant stressor" (Tr. 1484).   August, 2013 therapy records state that Plaintiff was "very fragile" due to his father's death and a disagreement with his wife (Tr. 1485-1486).   September, 2013

-8-

records state that Plaintiff expressed anxiety regarding his ability to return to work as a carpenter (Tr. 1488).

The same month, Dr. Traitel composed a letter to Plaintiff's auto insurance provider regarding Plaintiff's condition, stating that as a result of the car accident, Plaintiff was "essentially disabled from performing his prior physically and mentally demanding occupation in the construction trade" and that the "memory problems" were "complex and appear to be more than moderate" (Tr. 1489). Dr. Traitel stated that Plaintiff was "easily distracted," forgot appointments, lost objects, and experienced mild expressive aphasia consistent with a closed head injury (Tr. 1490). Treating notes from the following month state that Plaintiff felt more clear-headed when his pain level was lower but that financial constraints were stressful (Tr. 1491). Dr. Traitel found that Plaintiff's condition was "deteriorat[ing]," but later in the month, improved with "emotional calming" and cognitive/behavioral therapy (Tr. 1492-1493). Treating notes from the following month note an anxiety attack-like incident in which Plaintiff became dizzy and short of breath (Tr. 1495).

February, 2014 records state that Plaintiff experienced depression due to "increasing awareness of his physical limitations," chronic pain, and uncertainty about the future (Tr. 1499). Notes from later the same month indicate that Plaintiff was counseled in handling stress through "deep-relaxation techniques and cognitive reframing" (Tr. 1501). Notes from the next month note improvements "cognitively and emotionally" (Tr. 1502). Plaintiff continued to exhibit cooperative behavior and the ability to follow recommendations (Tr.

1502).  In April, 2014 Dr. Traitel noted that Plaintiff was "despondent about his future" (Tr.

1504).  Dr. Traitel noted that Plaintiff had not received "cognitive rehab" since the accident,

noting that such therapy could be "an additional tool to help . . . recovery" (Tr. 1504).  Notes

from later the same month state that Plaintiff experienced "agitation and stress" due to

increased physical pain (Tr. 1505).  Notes from the following month state Plaintiff's "desire

to be employed or self-employed again" was "understandable" but "not realistic" (Tr. 1506).

Plaintiff reported that he was resigned to a limitation to "moderate physical exercise" (Tr.

1507).

In June, 2014, Dr. Traitel completed a Mental Residual Functional Capacity

Questionnaire, noting that he currently saw Plaintiff every other week for a one-hour session

(Tr. 1509).  He stated that Plaintiff currently took Percoset, Vicodin, and Cymbalta, noting

that the medications, as well as psychotropic medication "can cause drowsiness, headaches,

problems concentrating, [and] short-term memory lapses" (Tr. 1509).  He found that as a

result of depression and anxiety, Plaintiff experienced "disrupted cognitive processing,"

adding that "chronic pain," also caused concentrational problems (Tr. 1509).  He found that

Plaintiff was emotionally withdrawn or isolated, easily distracted, and experienced a memory

impairment (Tr. 1510).  He found that Plaintiff was "seriously limited but not precluded"

from remembering work-like procedures, maintaining attention for two hour segments,

completing a workweek without psychological limitation, performing at a consistent pace,

and dealing with normal workplace stress (Tr. 1511).  Dr. Traitel found that Plaintiff would

be unable to deal with the stress of semiskilled or skilled work (Tr. 1512).  He found that due

to Plaintiff's condition, he would be absent from work more than four days each month (Tr.

1512).   He found that Plaintiff would be capable of handling his benefit funds (Tr. 1513).

He assigned Plaintiff a GAF of 55[4] (Tr. 1509).

### C.  Vocational Expert Testimony

VE Diane Regan classified Plaintiff's past relevant work as a carpenter as skilled and

exertionally medium and driver, semiskilled/light[5] (Tr. 91).   The ALJ then posed the

following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age,

education, and past relevant work:

> [A]ssume a person . . . . [w]ho is able to lift up to 20 pounds occasionally.  Lift
> or carry up to 10 pounds frequently.   And light work as defined by the
> regulations.   No climbing ladders, ropes, or scaffolds.   Occasionally climb
> ramps or stairs balance, stoop, crouch, kneel, and crawl . . . . [A]void all
> exposure to unprotected heights. . . . And work would be limited to simple,
> routine, and repetitive tasks performed in a work environment free of fast-
> paced production requirements involving only simple work-related decisions
> and with few, if any, workplace changes.  Can an individual with these

---

[4]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or
moderate difficulty in social, occupational, or school functioning.  *DSM-IV-TR*.

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires
"lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of
objects weighing 50 pounds or more. § 404.1567(e).

limitations perform claimant's past relevant work as claimant performed or a customarily performed? (Tr. 91-93).

The VE testified that given the above limitations, the hypothetical individual would be unable to perform Plaintiff's past relevant work (Tr. 93). She found that the individual could perform the unskilled, light exertional work of a packer (6,000 positions in the regional economy); sorter (5,000); and small products assembler (10,000) (Tr. 93). She testified that if the same individual were additionally limited to sedentary work restricted to only occasional lifting of 10 pounds; standing/walking for six hours in an eight-hour workday; and sitting for six hours, he could perform the job of inspector (2,000); sorter (2,000); and assembler (3,000) (Tr. 94). The VE testified that the inability to sit for six hours a day or stand/walk for two would eliminate all work (Tr. 94-95). The VE stated that her job testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 95).

### D.    The ALJ's Decision

At Step One of the sequential analysis, ALJ Maclean noted that Plaintiff received reimbursement for driving his wife to her medical appointments between the alleged onset day of March 2, 2010 through December, 2010 (Tr. 20). The ALJ found that Plaintiff's work activity amounted to Substantial Gainful Activity (Tr. 20). Accordingly, he found that Plaintiff was not disabled for that period.

He then continued his analysis of the period from January 1, 2011 through the date

of the decision.   At Step Two, the ALJ found that Plaintiff experienced the severe

impairments of "lumbar disc displacement with radiculopathy, lumbar fusion, degenerative

disc disease of the lumbar spine, status post left shoulder rotator cuff tear repair, and major

depressive disorder/anxiety" but at Step Three, found that none of the conditions met or

medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr.

21).   The ALJ found that Plaintiff experienced mild limitation in activities of daily living and

and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 21-

22).   The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for

sedentary work with the following non-exertional limitations:

> [N]o climbing of ladders, ropes, or scaffolds; occasional climbing or ramps
> and stairs, balancing, stooping, kneeling, crouching, and crawling; avoid all
> exposure to unprotected heights; and work is limited to simple, routine, and
> repetitive tasks, performed in a work environment free of fast-paced
> production requirements, involving only simple, work-related decisions, and
> with few, if any, workplace changes (Tr. 23).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform his past

relevant work, he could perform the jobs of packer, sorter, and small products assembler (Tr.

30-31, 93).

The ALJ discounted Plaintiff's allegations of  disability (Tr. 24-25).  He cited a

March, 2011 MRI of the cervical spine showing only "very mild" cervical spondylosis and

negative MRIs of the brains and pelvis (Tr. 24).  He cited November, 2011 medical records

showing that Plaintiff "remained ambulatory and could drive, perform light work around the

house, and perform most activities of daily living (Tr. 25). He cited a treating source's finding from the following month that Plaintiff was doing "quite well" (Tr. 25 *citing* Tr. 584). The ALJ cited January, 2012 records showing the absence of radiculopathy in any of the extremities (Tr. 25).

The ALJ noted that between June, 2013 and May, 2014, Plaintiff received psychological therapy from Dr. Traitel (Tr. 27, 29). The ALJ accorded "little weight" to Dr. Traitel's June, 2014 opinion that Plaintiff would miss more than four days of work each month due to mental impairments (Tr. 29). The ALJ noted that the GAF of 55 assigned by Dr. Traitel the same month suggested only moderate psychological limitation (Tr. 29). He noted further that Dr. Traitel's finding that Plaintiff would be required to miss work more than four days a month was undermined by the fact that Plaintiff did not require psychotropic medication (Tr. 29). The ALJ cited May, 2014 treatment records showing an appropriate mood and affect and "coherent and organized" speech (Tr. 27).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,*

305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATION

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at

step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the

residual functional capacity to perform specific jobs existing in the national economy."

*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.   The Treating Source Analysis

 Plaintiff argues that the ALJ erred by according "very little weight" to Dr. Traitel's

June, 2014 psychological assessment. *Plaintiff's Brief* at 4-8, *Docket #14,* Pg ID 2258 (*citing*

Tr. 29).  First, he argues that his non-use of psychotropic medications was not a proper basis

for the rejection of the treating source opinion.  *Id.*  Second, he disputes the ALJ's rejection

of the relatively low GAF scores assigned by Dr. Traitel, arguing, in effect that the treating

records support the low GAFs.  *Id.*  Plaintiff contends that under 20 C.F.R. § 404.1527(c)(2),

the ALJ was required to adopt the treating opinion.  *Id.*

Plaintiff's argument is correct to the extent that if an opinion by an acceptable treating

source "is supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in [the] case record, it must be

given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009)(internal

quotation marks omitted)*(citing Wilson v. CSS,* 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R.

§ 404.1527(c)(2)).  However, in the presence of  substantial evidence contradicting the

treating source opinion, the ALJ may reject all or a portion of the treating source's findings,

*see Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided

-16-

that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2))[6].

As a preliminary matter, the Court notes that the ALJ actually adopted the bulk of Dr. Traitel's June, 2014 assessment. Dr. Traitel found that Plaintiff was precluded from skilled and semiskilled work (Tr. 1512). Dr. Traitel's opinion that Plaintiff was incapable of even semiskilled work is reflected in the RFC for only unskilled work (Tr. 23, 93). Likewise, the RFC for "simple, routine, and repetitive tasks," "a work environment free of fast-paced production requirements," only "simple, work-related decisions," and, "few, if any, workplace changes" reflects Dr. Traitel's finding that Plaintiff's work abilities were "seriously limited but not precluded" by concentrational problems and psychological symptoms (Tr. 23, 1511).[7]

The ALJ rejected Dr. Traitel's findings only as to (1) the GAFs suggesting disabling psychological limitation and, (2) the finding that Plaintiff would miss more than four days of work each month (Tr. 27, 29). The ALJ's rejection of these findings is well supported and explained. The ALJ noted that Plaintiff testified at the hearing that he did not take

---

[6]

In explaining the reasons for giving less than controlling weight to the treating physician opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

[7]

Likewise, the ALJ's finding that Plaintiff was incapable of his past relevant work does not contradict Dr. Traitel's September, 2013 letter to Plaintiff's auto insurance company stating that Plaintiff was incapable of "performing his prior physically and mentally demanding occupation in the construction trade" (Tr. 1489).

psychotropic medication (Tr. 27 *citing* Tr. 85). The ALJ did not err in concluding that Plaintiff's lack of need for psychotropic medication undermined the low GAFs and the finding that he would be required to miss more than four days of work each month. *See* 20 C.F.R § 404.1529(c)(3)(iv)(type and dosage of medication relevant to determination of the alleged severity of symptoms); *McKinney v Commr of Soc Sec*, 2009 WL 877668, *10 (E.D. Mich March 30, 2009)(ALJ permissibly found that lack of need for psychotropic medication stood at odds with allegations of significant psychological limitation). While Plaintiff argues in reply that he did not take psychotropic medication because he experienced stomach problems after taking pain medication, *Reply,* 2, *Docket #18,* Pg ID 2321, he cites no evidence showing that he experienced side effects from psychotropic medication, much less that he tried but failed to find a psychotropic medication without side effects.

Likewise, the ALJ's finding that the lower GAF scores stood at odds with both the psychological treating records and the record as a whole should not be disturbed (Tr. 27). A GAF or Global Assessment of Functioning "is a subjective evaluation of a claimant's overall functional ability." *Hernandez v CSS*, 644 Fed Appx 468, 470 (6th Cir. March 17, 2016)(*citing DeBoard v. CSS,* 211 Fed.Appx. 411, 415 (6th Cir.2006). "We have previously noted that 'the Commissioner has declined to endorse the [GAF] score for use in the Social Security and Supplemental Security Income disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.'" *Id. (citing DeBoard* at 415)(internal quotations omitted).

Nonetheless, the ALJ properly considered and addressed the range of GAF scores assigned between 2012 and 2014 in rejecting Dr. Traitel's finding that Plaintiff required more than four absences each month. *Miller v CSS*, 811 F3d 825, 836-837 (6th Cir. 2016); *Staymate v. CSS*, No. 16-3896, 2017 WL 902136,*4 (6th Cir. March 7, 2017). He noted that the GAF of 50 (indicating possibly disability level limitations) was undermined by the fact that Plaintiff did not require psychotropic medication (Tr. 27, 29). The ALJ noted that the records as a whole and the GAF of 55 assigned at the time of the June, 2014 assessment (showing at most moderate work-related limitation) stood at odds with the earlier, lower GAFs (Tr. 27, 29). *See fns* 2, 4, above. Indeed, while Dr. Traitel assigned Plaintiff a GAF of 50 at the time that individual therapy began in June, 2013, Dr. Traitel's records from that month through May, 2014 note that the GAF of 50 was assigned at the commencement of treatment, rather than reassessed at each session (Tr. 1482-1507). As such, the one-time GAFs of 50 by Dr. Traitel and the July, 2012 GAF 40 by Dr. Saeed cannot be interpreted to reflect Plaintiff's long-term psychological limitations. "[W]hile GAF scores may be evidence of serious symptoms, '[t]hey are subjective opinions, representing a snapshot of a person's level of functioning at a given moment in time, not a rating of their ability to work.'" *Sessor v CSS*, 2012 WL 4369071,*7 (E.D. Mich September 25, 2012)(*citing Jordan v. CSS*, 2011 WL 891198, *5 (E.D.Mich. January 14, 2011)).

The ALJ also noted that Plaintiff's regular activities undermined Dr. Traitel's finding that Plaintiff would be absent more than four days each month. The ALJ observed that Plaintiff, by his own account, was able to walk to four miles each day, prepare meals, clean, do laundry, drive, use a computer, go to the movies, pay bills, and write (Tr. 29). The ALJ noted further that between the time of Plaintiff's motor vehicle accident and 10 months later, Plaintiff was able to make the 40-minute drive to and from his wife's medical appointments (Tr. 29). Because the ALJ's rationale for rejecting a portion of Dr. Traitel's opinion constitutes "good reasons," a remand is not warranted. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); SSR 96–2p, 1996 WL 374188, *5 (1996). The ALJ's findings are also supported by my own review of the record showing that Plaintiff repeatedly appeared alert and fully oriented with good judgment, a normal mood and affect, and unremarkable communicative skills during the relevant period (Tr. 584, 863, 926, 952, 1065, 1097).

In conclusion, the ALJ's partial rejection of Dr. Traitel's opinion is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and as such, should not be disturbed by this Court. *Mullen v. Bowen*, *supra*. However, it should noted that Plaintiff's arguments for remand address only the ALJ's rejection of Dr. Traitel's opinion, and my analysis is restricted to whether the ALJ's discussion of the treating opinion of psychological limitation is adequately explained and supported by substantial evidence. Accordingly, my recommendation should not be interpreted to extend to Plaintiff's possible physical limitations, or more generally, his entitlement to personal injury protection benefits

("PIP") under Michigan law.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #17] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #14] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R.  Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 14, 2017

### CERTIFICATE OF SERVICE

I hereby certify on July 14, 2017, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on July 14, 2017.

s/Carolyn Ciesla
Case Manager to
Magistrate Judge R. Steven Whalen